[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a continuation of a dissolution action brought in 1986 by the plaintiff wife in which a dissolution was entered in June of 1988 in accordance with a stipulation agreed to by the parties in open court and entered as a part of the decree of the court.
Under the stipulation, the plaintiff agreed not to ask for alimony for a period of two years after the entry of the decree. She is now seeking that alimony.
The provisions of the stipulation concerning alimony are contained in Article II, sections 2.2, 2.3 and 2.4. They provide as follows:
 2.2 The WIFE agrees not to petition for any alimony during the first twenty-four months CT Page 1291 from the date of the decree of dissolution of marriage. At the end of said period, if the WIFE is alive and has not remarried and the HUSBAND is alive, the court will enter appropriate orders for alimony to the WIFE, but the alimony term shall not exceed a date of seven years from the date of the decree of dissolution of marriage. The Court, at such time, shall take into consideration the statutory criteria as set forth in Section 46b-81 of the General Statutes of Connecticut, as well as the HUSBAND's obligation for the child support provisions as provided in this Agreement.
 2.3 On or before June 1, 1989, the parties shall exchange financial affidavits, in the usual Connecticut form, showing their respective income, assets, liabilities and living expenses. On or before June 1, 1989 the parties shall exchange the following documents:
 A. Income tax returns for the period 1986, 1987 and 1988.
 B. All income and receipts of all monies for the period of January 1, 1989 to May 31, 1989.
 C. As to each of the parties' interest in any proprietorship, partnership or corporation, tax returns for said entity for the period from 1/1/86 to date and financial statements of said entities for said period.
 D. All other relevant data to support the financial affidavit submitted by each party.
 2.4 Any order for alimony entered in accordance with the above shall be retroactive to the date which is computed to be twenty-four months from date of the decree of dissolution of marriage.
There are no prior alimony orders in view of the provision in the stipulation prohibiting a request for alimony until two years after the decree and there is no motion to modify any such orders. Consequently, there is no need to find any substantial CT Page 1292 change in circumstances as the defendant has claimed.
There are two issues here:
1. the amount and duration of alimony, both lump sum and periodic; and,
2. the amount of counsel fees, if any, for the plaintiff.
As to the second question, the court finds that the terms of the stipulation entered into in 1988 and made part of the court's decree control. These terms expressly state that the parties shall pay their own counsel fees. See page 38, Article XII, subsection 12.2, of the agreement which reads as follows:
 Each of the parties shall be responsible for their respective counsel fees incurred in the negotiation and preparation of this agreement and in the pending dissolution action between the parties.
The present proceeding in which the plaintiff is seeking alimony in accordance with the aforesaid provisions of the stipulation agreement and decree is a part of the dissolution proceedings in this court's opinion and, consequently, each party is responsible for his or her counsel fees.
The request for counsel fees is, therefore, denied.
On the question of alimony, the court must consider the Factors set forth in 46b-82 (not 46b-81) of the Connecticut General Statutes. These are not identical as plaintiff's counsel claims. Section 46b-81 includes provisions for considering the contribution of each to the accumulation of the assets and the opportunity of each to acquire future assets. Section 46b-82
has no such provision but does include a provision to consider the advisability of the mother of the minor children working.
Both require consideration of the length of the marriage, the causes for the dissolution, the age, health, station, occupation, income and sources of income, vocational skills, employability, estate, needs of each of the parties, and the desirability of the parent with physical custody working.
There is one limit placed by the stipulation on the court's discretion in awarding alimony and that is it can be for no more than five years since it is to be retroactive to two years after the decree and may not last for more than seven years after the decree. (See exhibit F, Article II, subsections 2.2 and 2.4.) CT Page 1293
While the court inadvertently used the word periodic in describing the alimony the court could award in its memorandum of decision on the motion to strike, that was not an accurate statement. The court may indeed award both lump sum and periodic alimony. See Eldridge v. Eldridge, 4 Conn. App. 489 at 492; Basile v. Basile, 185 Conn. 141, 142, 143.
There appears to be no provision in the separation agreement which specifically prohibits it, and the provision concerning alimony does not limit it in any way except duration. (Parenthetically, the defendant's excerpting from a sentence the words "no fixed sum" to sustain his claim that lump sum alimony may not be awarded was disingenuous. The remainder of that sentence indicates that the allusion was to the support order, not to the alimony. See Article X entitled "Tax Application" at pages 33 and 35 of the stipulation.)
The stipulation upon which the court entered its decree provided for the plaintiff to receive the family home valued by the plaintiff at the time at $750,000.00 and by the defendant at $975,000.00 and now in the plaintiff's recent affidavit at $850,000.00. The plaintiff also agreed to be responsible for two mortgages on the property, one in the amount of $95,000.00 and the other in the amount of $144,000.00. There was also a third mortgage. As to that, the plaintiff agreed to pay the defendant $63,000.00 and the defendant was then to obtain an assignment of the mortgage to the plaintiff's father, Mr. William Cash, and also to he responsible for any interest charges or costs over $63,000.00.
The defendant also agrees to be responsible for other encumbrances on the property including an FSIL loan in the amount of $265,000.00 and any other encumbrances on the land records subsequent to the lis pendens filed by the plaintiff.
Joint legal custody of the four children was awarded both parties with physical custody in the plaintiff. The defendant was ordered to pay $36,000.00 a year for the support of the parties' four children who are John M. Tremaine, Jr., born April 14, 1974, Hunter Cash Tremaine born September 1, 1976, Catherine Hall Tremaine born February 9, 1982, and Alexandra Austin Tremaine born July 8, 1984.
At the time of the dissolution stipulation, the defendant listed his assets at $1,114,266.00. He failed to list a receivable from his wholly owned PRIMO Company in the amount of $343,000.00 and listed as a personal debt a debt of his PRIMO, Company in the amount of $265,000.00. Thus, his assets should have been increased by some $608,000.00. (See exhibit L.) CT Page 1294
The defendant's income at the time was listed at $120,000.00 a year from his two companies, PRIMO and Tremaine Associates. He also listed additional income of $16,000.00 a year which he said were pledged for payment of a loan.
The plaintiff, a college graduate, had been active in community volunteer activities. Her work experience has been minimal since the marriage. She was taking care of the house and four children, ages in 1987 four, five, eleven and thirteen. She did have income from her investments in the amount of $710.59 a month gross or $532.44 net. Her expenses, however, at that time were $17,526.84 a month. At the present time they are about $10,917.00 a month.
At the time of the separation agreement the defendant pleaded financial hardship, and in June of 1987, midway through the divorce proceedings, he filed a petition in bankruptcy for his PRIMO corporation.
The court must now consider the various elements listed in Connecticut General Statutes 46b-82 in determining the amount of alimony and duration, if any, to be awarded.
1. LENGTH OF THE MARRIAGE:
The parties were married in 1972 and separated in 1986 so that the marriage lasted approximately 14 years.
2. CAUSE OF DISSOLUTION:
The testimony of the plaintiffs was that the defendant became interested in another woman, who has since become his; wife, and for that reason the marriage broke down. Defendant did not deny this. Consequently, it would appear that the cause of the dissolution was the defendant's conduct.
3. AGES:
The plaintiff is 46 years of age and the defendant is 44 years of age.
4. HEALTH:
Both parties appear to be in good health with the plaintiff having some knee problems which do interfere with some of her activities.
5. STATION: CT Page 1295
Both parties have been accustomed to an exceedingly affluent lifestyle and led active, social lives. (See exhibits A and B and financial affidavits.) Each party now lists weekly expense of between $2,000.00 and $3,000.00.
6. OCCUPATIONS:
The defendant has been engages in two business enterprises in the field of lighting design. He has operated both business during the marriage and is currently doing so. He is the sole owner and stockholder of both companies known as Primo Design Limited and Tremaine Associates.
The plaintiff has not worked outside of the home during her marriage. Her occupation has been the care of the home and the raising of the four children and participation in volunteer activities. She recently held a part time job in a restaurant as a hostess but stopped working because it interferes with her time with the children. She also annually hosts an antique show in her home for which she nets $2,000.00.
7. INCOME:
In determining the defendant's income available for alimony the operative word is available. The defendant has access to at least four sources of income, three of which he has total control. The three are: Primo Design Limited, Tremaine Associates, and the BG Tremaine Trust Number 7, Fund B, except for the Miller stock. He is the sole owner, officer and shareholder of both Primo Design and Tremaine Associates. He sets his own salary in each. That salary has fluctuated from $60,000.00 in each company in 1987 to $30,000.00 in Primo and $50,000.00 in Tremaine in 1988 to zero in each in 1989 to $72,904.00 for both in 1990 to $86,996.00 in 1991. (See affidavits for September, 1987, September, 1990, and February and April of 1991.)
The companies providing that income increased in value, Primo from a negative value in 1987 to $170,000.00 in 1990 to $325,000.00 in 1991. Tremaine, on the other hand, has decreased from $2,000.00 in 1987 to $886.00 in 1990 but then increased to $8,403.00 in 1991. (See financial affidavits of defendant, exhibits M, HH and E.) Of course, there is no indication of how these valuations were arrived at; presumably they may have been done by the defendant. His earnings from these companies have increased since 1988 when the total was $35,000.00 from both of them to $72,000.00 in 1990 and $85,000.00 in 1991.
The defendant's affidavits also reflect trust income of zero in 1987, $589.00 a week in February and April of 1991. (See CT Page 1296 exhibits E, M, HH and current affidavit.) The defendant's accountant, Leech Leech, prepared a two year comparison of the defendant's earnings which increased from $122,185.00 in 1988 to $158,047.00 in 1989. That did not include, however, $7,232.00 in tax exempt interest bringing the total in 1989 to $165,279.00. See exhibit Q.
It is clear to the court that the defendant's earning capacity, therefore, from wages alone is at least $120,000.00 a year. When to that is added income from interest, dividends and royalties, which appear to have been regular, an additional $38,000.00 to $96,000.00 must be added per year (see exhibits Q and M). Only the wages are subject to his total control as has been pointed out above.
Some of the interest as well as other income is also subject to his total control. In the trust agreement for BGT Trust Number 7B (see exhibit 15) the defendant has the right from time to time to choose an investment broker who has the right not only to invest and reinvest the principal of the trust, except for the Miller stock, but also to dispose of that principal. Without the Miller stock, the principal in the trust in 1989 was over a million dollars. (See exhibit HM, page 6.)
In fact, the trust in 1988, shortly after it was established, bought the defendant the house in which he presently lives at a cost of some $520,000.00 plus additional funds of $124,000.00 for furnishings. He lives in the houses rent free with his present wife. His affidavit, exhibit HH, lists the house as being included as part of the trust principal at a value of $498,000.00. (However, the trust principal over which he has no control includes Miller Company stock.) It would certainly seem that this house is an asset of the defendant's since he has total control of the disposition of the principal of which this is a part.
The defendant was also able to obtain additional funds from that trust in 1988 and 1989 amounting to about $50,000.00; to wit, $33,000.00 for wedding expenses, $10,000.00 for legal fees, $8,000.00, plus or minus, for payment of a loan.
Further, in all three affidavits, the defendant has listed the AmeriTrust, which is in effect his investment agent, as having a loan of $103,800.00 against which it holds collateral of 366 shares of Miller stock valued at $416.00 per share. However, in 1989, the defendant's interest in the Miller stock increased from 1.9 per cent of the total 19,000 shares to 3-9 per cent which is 741 shares. The valuation, furthermore, appears to be $444.00 per share, not $414.00 as indicated in the defendant's most recent affidavit. (See exhibit UU and MM.) This is almost CT Page 1297 double the amount given for the value of the collateral pledged for the $103,000.00 loan and is more than ample to have paid off the loan. However, no payment has been made on that loan or at least the principal amount of the loan has not changed since 1988. There appears to be no pattern, furthermore, for making any payments on it. The result of this is that the defendant's net from the AmeriTrust account is substantially more than the $48,456.00 given in his most recent affidavit. It is instead $225,204.00. This it must be pointed out is a revocable contract between the defendant and AmeriTrust. (See exhibit 18.) Again, this is subject to defendant's control since there is only the requirement of written notice in the agreement for termination.
It is also clear that he has had sources of income which were not really disclosed. This is apparent from the note, exhibit MMM, which he wrote his then attorney stating that he had provided $204,000.00 for his children's education and an additional amount for zero coupon bonds which he said total $604,000.00 for both, the cash and the bonds, in 1989. It thus appears that he has the ability to generate rather substantial funds at will.
He also received income from the Miller Company in 1989 in the amount of $74,831.00 as well as a property distribution of $86,600.00. (See exhibit MM.)
Finally, the court round Mr. Tremaine's testimony lacking in credibility. This was reinforced by the statement in the reports of his accountants for Primo Design from 1987 through 1989. Each report contains the following at the beginning of the report:
 Management has elected to omit substantially all of the disclosures ordinarily included in financial statements.
When this is coupled with the failure to list his interest in the Miller stock at 741 shares instead of 366 and when it is coupled with his testimony that although he had signed a statement in the bankruptcy court that he had done the inventory of the Primo Design stock, in fact, he had failed to do it and when it is further coupled with some of his testimony in which he appeared ignorant of his own income tax, the conclusion is inescapable that the defendant has been less than forthcoming.
The several affidavits which he has filed, in particular 1990 and the two in 1991, raise a number of questions. From February, 1991, until April, 1991, there was an increase in his liabilities from $98,000.00 to $200,000.00. At the same time the house provides for him by the trust is treated first as an asset in his 1990 affidavit, exhibit M, then as a CT Page 1298 part of the Number 7 trust principal, exhibit HH, then not mentioned, exhibit E.
Were the value of the house to be added to the total assets in exhibit E, the April 2, 1991, affidavit, assuming the valuation given by the defendant of $498,000.00, his total assets would be $891,121.00. The court believes that the house is his asset.
Further, of the liabilities stated particularly in the April affidavit, $50,000.00 consists of loans from his father and brother and $15,000.00 from his wholly owned two companies.
A major share of the balance of $200,000.00 appears to be for school expenses for the children. But Article 5, Section 5.1, page 18, of the separation agreement, exhibit F, recites that there are trusts which have been paying these expenses. The defendant appears only liable if the trust runs out of money. Moreover, he has stated, exhibit MMM, that he has provided a total of $605,000.00 for his children in zero coupon bonds and cash. Thus this expense would seem to be, at best, speculative.
In this connection, the defendant was ordered by Judge Coppeto to repay $7,433.00 which he had obtained from the children's trust fund to pay his support order. The trustee of those funds is his father.
In addition to the defendant's income, his wife is also earning $30,000.00 from the Primo company for a part time job and $10,000.00 in her own independent business. The defendant not only failed to indicate his wife's income but also what portion of the expenses that he listed were hers and what contribution, if any, she made to them.
All of the above indicates that the defendant's income and assets are substantially more than he reported in his affidavits or his testimony, and the court's orders will be based on this finding.
8. ESTATE:
The estate of each party has been set forth in the above discussion of income except for that of the plaintiff.
Plaintiff lists assets of $953,706.00 on her February 27, 1991 affidavit. That does not include, however, any valuation for the household silver, jewelry and furnishings which appear to have been substantial according to the defendant's testimony. Her major asset is the house which now has a valuation of $850,000.00 with an $87,000.00 mortgage on it. Her CT Page 1299 liabilities, however, are listed as $573,000.00, most of which appear to be owed to her parents. (See plaintiff's affidavit date, February 27, 1991, at Schedule B.)
Plaintiff's income with child support and dividends was a net of $819.00 a week. She did list expenses, however, of some $2,539.00 a week.
9. NEEDS OF THE PARTIES:
The needs of both these parties would appear beyond the ability of both of them to satisfy given their current incomes and assets. However, both seem to be continuing in the lifestyle to which they were accustomed, and the plaintiff is entitled to the support of the defendant in achieving as much of that lifestyle as she can without continuing to borrow from her parents. Both have listed expenses of over $2,000.00 a week in their affidavits.
10. VOCATIONAL SKILLS AND EMPLOYABILITY:
The defendant's vocational skills and employability are evident from the above discussion. The plaintiff's would appear to be limited both by her age and her absence from the labor market and the needs of her children.
It would appear from the lifestyle of both parties during the marriage and thereafter that the plaintiff will not be seeking employment. If she should seek employment, it is questionable whether her earnings, without some further training or education, would be at all substantial.
10. DESIRABILITY OF PARENT WITH PHYSICAL CUSTODY WORKING:
It is already apparent that the children of these parties have suffered from the divorce of their parents since some of them are in psychotherapy. This is reason enough to decide that it would not be in their best interests for the plaintiff to seek full time employment at this time. The most that might he appropriate would he part time employment.
Having considered all of these elements, the court enters the following orders:
1. The defendant is ordered to pay the plaintiff periodic alimony in the amount of $1,000.00 a week retroactive to June 1, 1990, and continuing to June 1, 1995.
2. The defendant shall also pay the plaintiff lump sum alimony in the amount of $350,000.00 payable three (3) months from CT Page 1300 the date of this decree.
It is so ordered.
MARGARET C. DRISCOLL STATE TRIAL REFEREE